UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSHUA SAATHOFF, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>GENE BY GENE, LTD. D/B/A FAMILYTREEDNA,<br><br>*Defendant.* | Case No. 1:24-cv-12118 |

**AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Joshua Saathoff, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Gene by Gene, Ltd. d/b/a FamilyTreeDNA ("FamilyTreeDNA") to put an end to its unlawful disclosure of Plaintiff's and the proposed Class's genetic information. Plaintiff, on behalf of himself and all other similarly situated, upon personal knowledge as to Plaintiff's own conduct, and on information and belief as to all other matters, including based on an investigation by counsel, complains and alleges as follows:

**NATURE OF THE ACTION**

1. This is a class action against FamilyTreeDNA for violating Plaintiff's privacy rights by disclosing consumers' genetic testing information, through the use of hidden tracking codes created by third-parties, Google, Inc. ("Google") and Meta Platforms, Inc. (formerly known as Facebook) ("Meta"), and integrated by FamilyTreeDNA into FamilyTreeDNA's platform for purchasing and analyzing genetic testing, familytreedna.com (the "Website").

2. Through the Website, consumers can order testing kits to "[b]egin [their] DNA

journey." Those testing kits are advertised as a way to "[u]nlock each part of [their customers'] genetic ancestry with autosomal DNA, mtDNA, and Y-DNA testing." The genetic testing allows Defendant's customers to make discoveries and insights about their family, paternal, and maternal ancestry, which FamilyTreeDNA refers to as "genetic genealogy."

3. But that's not all Defendant does with its customers' genetic testing information. Unbeknownst to consumers, Defendant shares its customers' genetic testing information with third parties—without the customer's consent—at each interaction with the Website.

4. In particular, FamilyTreeDNA shares its customers' genetic testing information with Google and Meta for advertising and marketing purposes.

5. Defendant makes these disclosures through hidden tracking technologies that were developed by Google and Meta and were incorporated by Defendant into the Website. The tracking technologies send Google and Meta time-stamped, personally-identifiable records of consumers, such as Plaintiff and Class members, including information which identifies a person as having purchased a genetic testing kit from FamilyTreeDNA and the identity of the person upon whom the genetic test was performed in a manner that permits identification of the subject of the test.

6. Google and Meta combine this personal information with other information about each consumer gathered from other sources and use it for marketing and advertising purposes.

7. Defendant's practice of disclosing its customers' genetic testing information to third parties without first obtaining consent violates the Illinois Genetic Information Privacy Act, 410 ILCS 513, *et seq*. ("GIPA"), which makes it unlawful for companies that collect genetic testing information to disclose such information to third parties without first obtaining written authorization. Defendant's disclosures also violate the federal Electronic Communications Privacy Act ("ECPA") and the Illinois' Eavesdropping Statute.

## PARTIES

8. Plaintiff Joshua Saathoff is a natural person and a citizen of the State of Illinois.

9. Defendant Gene by Gene, Ltd. d/b/a FamilyTreeDNA is a company organized and existing under the laws of Texas, with its principal place of business located at 1445 N Loop W, Houston, TX 77008. FamilyTreeDNA does business throughout the State of Illinois and throughout the United States.

## JURISDICTION AND VENUE

10. The Court has personal jurisdiction over Defendant because Defendant: (a) advertised its services to Plaintiff in Illinois; (b) sent numerous emails to Plaintiff in Illinois; (c) sold Plaintiff, an Illinois resident, a genetic testing kit while Plaintiff was located in Illinois; (d) shipped the genetic testing kit to Plaintiff in Illinois; (e) made its online platform for analyzing the results of the testing available to Plaintiff in Illinois; (f) installed the tracking technologies at issue on Plaintiff's computer, which was located in Illinois; and (g) through the tracking technologies installed on Plaintiff's computer in Illinois, caused Plaintiff's genetic testing information and communications with Defendant's website to be sent from Plaintiff's computer in Illinois to third-party marketing companies, as described herein.

11. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because: (a) there are at least 100 class members; (b) the matter in controversy exceeds $5 million, exclusive of interest and costs; and (c) at least one plaintiff is a citizen of a different state than at least one defendant.

12. Venue is proper in this District under 28 U.S.C. § 1441(a) because the case was originally filed in the Circuit Court of Cook County, Illinois, and Defendant thereafter removed it to this District. *See* ECF 1.

## COMMON FACTUAL ALLEGATIONS

***Illinois' Genetic Information Privacy Act.***

1. Recognizing that "[t]he public health will be served by facilitating voluntary and confidential nondiscriminatory use of genetic testing information," the Illinois Legislature enacted GIPA. 410 ILCS 513/5.

2. Under GIPA, "genetic information" includes "[a]ny request for, or receipt of, genetic services, … by the individual or any family member of the individual." 410 ILCS 513/10; 45 CFR 160.103.

3. Under GIPA, "genetic services" means, among other things, "[a] genetic test." 410 ILCS 513/10; 45 CFR 160.103.

4. Under GIPA, "genetic testing" and "genetic test" mean "an analysis of human DNA, RNA, chromosomes, proteins, or metabolites, if the analysis detects genotypes, mutations, or chromosomal changes." 410 ILCS 513/10; 45 CFR 160.103.

5. Under GIPA, genetic testing and genetic information is confidential.

6. Section 15 of GIPA proscribes any person from, among other things, disclosing genetic testing and information derived from genetic testing to any person other than the individual tested or to persons specifically authorized in writing in accordance with the Act. *See* 410 ILCS 513/15(a).

7. Section 30 of GIPA, in turn, separately provides that "[n]o person may disclose ... the identity of any person upon whom a genetic test is performed … in a manner that permits identification of the subject of the test," except to certain enumerated third parties not applicable here. 410 ILCS 513/30(a).

8. As discussed throughout this Complaint, Defendant violated GIPA by disclosing to

a third-party marketing company the identities of individuals who requested, purchased, and completed a genetic test in a manner that permitted their identification.

***Background on Web Browsers, Source Code, & Tracking Technologies.***

9. Web browsers are software applications that allow consumers to exchange electronic communications over the Internet.

10. Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with Internet users via their web browsers.

11. When an individual uses a web browser to navigate to a website, a number of communications occur between the user's computer and the server that hosts the website. The messages between the user's computer and the server that hosts the website include the following contents:

a) *A "GET request" sent from the user's computer to the website server, and a responsive "POST" request sent from the website server to the user's computer* When an individual internet user visits a webpage, his or her web browser sends a message called a "GET request" to the webpage's server. The GET request tells the website what information is being requested and then instructs the website to send the information back to the web browser on the user's computer, which the website does via a responsive "POST request" sent to the users' web browser. The GET and POST requests include the content the user requested the website to display.

b) *The URL*. The uniform resource locator, or URL, is the location of the requested content on the web server. The URL of a webpage is typically shown in the address bar of the user's browser. URLs often use plain language to describe the associated content (*e.g.*, www.website.com/descriptionofcontentonpage).

c) *The IP address of the user's connection to the internet.* IP stands for "Internet Protocol." When connected to the Internet, each device is assigned a unique IP address by the Internet Service Provider ("ISP") that is providing the internet connection. IP addresses may change over time but often do not. In many cases, an ISP will continue to assign the same IP address to the same device.

d) *Information on the User Agent*. A user agent is the hardware and/or software responsible for retrieving the requested content, such as the device, operating system and web browser.

e) *A Timestamp*. A timestamp is the time of a request or event that a computer records. The timestamp displays when certain information was requested or exchanged.

12. In addition to exchanging the above communications with users' computers, websites can also cause tracking technologies (often referred to as "cookies") to be installed on the accessing users' computer. These technologies are small files that the website places on the user's web browser to collect data about the user's online activity. These technologies work by assigning or associating the user with a unique identifier, storing that identifier with other information about the user (*e.g.*, geographic location, device specifications, etc), gathering data on the user's activity on the website in real time, and transmitting that data to the host website and the third-party technology vendor. Two of the primary reasons website operators use these technologies is to (a) track user's activity on the website; and (b) enable the website host to subsequently serve the website user with targeted advertising across the internet.

13. By directing user's data, activity, and communications with the website to third-party technology vendors, these technologies effectively open a spying window through which a website funnels data about users and their actions to third parties.

14. Tracking technologies are installed by web developers on pages of the websites they host that are run on the host's servers. In other words, the entity operating the website decides which tracking technologies to include on the website and, thereby, install on website users' web browsers.

15. When a user accesses a website that has tracking technology, the website deploys tracking technology onto the web browser on the user's computer in the location in which the computer is located (in this case, in Illinois).

16. Thus, without any knowledge, authorization, or action by a user, a website developer, like Defendant, can deploy tracking technologies to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' data, online activity, and communications with the website to third-party technology vendors.

17. After a tracking technology is surreptitiously installed on a user's web browser by the website, it directs the user's browser to send the user's communications with the website (*e.g.*, those described in Paragraph 15 above), along with other data about the user (*e.g.* the unique identifiers described in Paragraph 16 above), to the third-party technology provider. That message is sent by the user's browser from the location in which the user's computer is located (in this case, in Illinois).

18. This secret transmission to the third-party technology provider contains the original communications exchanged between the web browser and the host website (*e.g.*, the "GET requests" and "POST requests"), along with additional data that the tracking technology is configured to collect (*e.g.*, unique identifiers that allow the technology providers to associate the collected data with the individual website user).

19. The transmission is initiated by the tracking technology's code and is concurrent

with the website user's communications with the host website. Two sets of code are thus automatically run as part of the user's web browser's attempt to load and read the host website—the website host's own code (which communicates with the user's web browser to deliver the requested web content), and the tracking technology's code (which captures those communications and combines them with information identifying the user).

20. Once the third-party technology vendor collects the information transmitted by the tracking technology, it can store and use the information for various business purposes of their own (in addition to the website host's business purposes), including targeted advertising for the technology vendor or its other advertising customers.

***The Facebook Pixel***

21. One such tracking technology is the Facebook Pixel.

22. The Facebook Pixel is a tracking pixel that is used to track and disclose individuals' online activities to Meta.

23. Meta is an advertising company which sells advertising space on the social media platforms it operates, including Facebook and Instagram.

24. Meta calls itself a "real identity platform," meaning users are allowed only one account and must share the name they go by in everyday life. Users must provide Meta their first and last name to create an account.

25. Meta's advertising is based on sophisticated user-categorizing and targeting capabilities that are fueled by the personal data of users of the social media platform and other Internet users.

26. Meta surveils users' online activities both on and off Meta's own websites and apps, which allows Meta to make highly personal inferences about users, such as about their interests,

behavior, and connections.

27. Meta compiles information it obtains and infers about Internet users and uses it to identify personalized audiences likely to respond to particular advertisers' messaging.

28. The Facebook Pixel is a free and publicly available piece of code that Meta allows third-party website developers to install and integrate into their websites.

29. The code that is used to execute the Pixel functions is written into the base code of the website.

30. The Facebook Pixel is installed on a website as a first-party cookie.

31. Cookies are small pieces of text used to store information on web browsers. They store and receive identifiers and other information on computers, phones and other devices, and they can serve a number of different functions, such as personalizing content and tailoring and measuring ads.

32. A "first-party cookie" is designed to circumvent improvements in how web browsers block third-party cookies (a primary means by which Meta historically tracked people across the web). Being embedded in websites as a first-party cookie, rather than as a third-party cookie, causes users' browsers to treat that Pixel as though it is offered by the website they are visiting, rather than by Meta, a third party.

33. When the Pixel is embedded in a website as a first-party cookie, the third-party cookie blocking functions of modern web browsers do not inhibit the Facebook Pixel's collection of data.

34. Because of the Pixel design, the Pixel causes users' browsers to treat the Pixel as though it is offered by the website itself.

35. From a technological perspective, the Pixel is a part of the code of the website, and

a users' browser understands the Pixel to be a part of the website itself, not a third-party.

36. The Facebook Pixel is configured to capture a substantial amount of information by default.

37. Since 2015 when it was introduced, the Facebook Pixel has transmitted HTTP header information, including the URL of each page visited on a website, by default. HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."

38. Meta also automatically collects "Pixel-specific Data," which includes "the Pixel ID and cookie."

39. For Facebook account-holders, "Pixel-specific Data" includes the "c_user" cookie, which transmits to Meta the users' Facebook user ID (a "Facebook ID").

40. The Facebook ID is a unique and persistent identifier assigned to each Facebook user.

41. The Facebook ID is personally identifiable information because it (a) identifies the individual user to Meta; and (b) allows anybody—not just Facebook—to identify the individual online. If anyone types www.facebook.com/[FacebookID] into a web browser, it will load that individual's Facebook page, which contains a person's name and often a person's photographs and location information.

42. The Facebook ID number is a number—just like a social security number, driver's license number, or telephone number—which can be used by anyone to identify an individual.

43. A Facebook ID is personally identifiable information. Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of https://facebook.com. By way of example, the Facebook ID for Mark

Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

44. A website developer can also choose to track actions taken on their website with the Facebook Pixel, called an "Event." When a chosen action is taken, the Facebook Pixel is triggered and sends Meta certain data describing the action(s) taken.

45. Meta associates the information it obtains via the Facebook Pixel with other information regarding the user, using personal identifiers that are transmitted concurrently with other personal information the Pixel is configured to collect.

46. The developer can then create "Custom Audiences" based on Events and can target ads on Meta's platforms.

47. Meta assigns a unique numerical identifier to each Facebook Pixel and maintains records associating each Pixel with the data it transmits and the website where it is embedded.

***Google Tracking Pixel***

48. Google developed and offers to website owners a similar tracking technology, referred to herein as the "Google Tracking Pixel."

49. By many measures, Google is the world's largest data company. Among other services, Google operates the world's most popular search engine (Google), email provider (Gmail), video website (YouTube), mapping service (Google Maps), Internet analytics service for web developers (Google Analytics), and web-browser (Chrome). It also operates various ad services that are among the world's most popular in their respective category, including the advertising services of Google DoubleClick and Google AdWords.

50. Website owners can use technologies offered by Google to track actions taken on their website, through a platform called Google Analytics. Google Analytics has massive reach.

As described by the Wall Street Journal, it is "far and away the web's most dominant analytics platform" and tracks, among other things, whether and when users log in and use a website.[1]

51. The Google Tracking Pixel is a collection of different types of cookies that website owners can deploy on their websites to track user activity for marketing purposes. Merely by way of example, one cookie associated with the Google Tracking Pixel is the _ga cookie, which is typically used to build custom audiences for remarketing or ad targeting.

52. Internally, Google connects the information received from the Google Tracking Pixel to a person's Google Account and other personally identifying information, including:

a. Google Account ID

b. IP address

c. User-Agent

d. Precise Geo-location

e. Shipping Address

f. Areas of Interest

g. PPID

h. Device ID

i. First Party User ID

j. Buy Side Publisher ID

k. DUSI

l. YouTube Visitor ID

m. Credit Card Information

[1] *Who Has More of Your Personal Data than Facebook? Try Google*, The Wall Street Journal (April 22, 2018) (available at https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401).

n. Age

o. Gender

p. Race

q. Ethnicity

r. Income

s. Children

53. When a user is logged into a Google or Gmail account, Google can also use Google __secure cookies associated with the user's Google Account to track a user's activity across the internet.

***FamilyTreeDNA & Its Use Of Tracking Technologies On The Website***

54. FamilyTreeDNA is a direct-to-consumer commercial genetic testing company that specializes in genetic genealogy—"the use of DNA testing to establish relationships between individuals and determine ancestry."

55. Genetic testing information is extremely sensitive. Defendant understands this and provides the following commitment to its customers: "we do not share your name or other common identifying information linked to your genetic data with third parties, except as legally required to comply with a valid subpoena or a court order or with your explicit consent."

56. FamilyTreeDNA offers users an online platform for purchasing genetic tests and analyzing genetic test results, familytreedna.com (defined above as the "Website").

57. The webpages on the Website are identified by URL.

58. FamilyTreeDNA includes a plain-language description of the contents of each webpage in the URL.

59. When a customer placed a genetic testing kit from FamilyTreeDNA in their online

shopping cart, the URL included the plain language description indicating that the webpage was a shopping cart. The URL was familytreedna.com/cart.

60. When a customer placed an order for a genetic test kit from FamilyTreeDNA, the URL included the plain language description that the webpage was the checkout page. The URL is familytreedna.com/checkout.

61. When a customer completed an order for a genetic test kit from FamilyTreeDNA, the URL included the plain language description thanking the customer for the purchase. The URL is familytreedna.com/thank-you.

62. Once an order was complete, the customer received a welcome email with a kit number and password with a link that directed the customer to the sign-in page on the Website. The URL of the sign-in page included the plain language description the customer was signing in. The URL is familytreedna.com/sign-in.

63. After a user signed-in (*i.e.* was authenticated), the user landed on a welcome screen. The URL for the welcome screen is familytreedna.com/welcome.

64. After the welcome screen, the user transitioned to the FamilyTreeDNA dashboard. The URL for the dashboard is familytreedna.com/dashboardv2.

65. FamilyTreeDNA included a tab on the dashboard for "Results & Tools." When a user did not have any genetic testing results, the user could not click on this tab.

66. In contrast, when a user had completed their genetic testing and their genetic testing results were available, the user could click on the "Results & Tools" tab in their dashboard and navigate to pages within the tab. For instance, a user could navigate to the "Family Finder Matches" page. The URL for this page was: https://www.familytreedna.com/my/familyfinder/matches/detail-view.

67. After a customer's genetic testing results were available, FamilyTreeDNA allowed the user to unlock additional features it called, "myOrigins," "ancientOrigins," "chromosome browser," and others. Each URL included the plain language description of the page, and each page was not available unless the user purchased the premium feature.

68. There are numerous features on the Website that a user could only access once their test results were available and, in some cases, when the user has added or upgraded to a particular feature. For instance, certain pages allowed a user with completed test results to view the user's Y-DNA Haplotree or mtDNA Haplotree. The corresponding URLs contain the following plain language: https://www.familytreedna.com/public/y-dna-haplotree/A and https://www.familytreedna.com/public/mt-dna-haplotree/L.

69. FamilyTreeDNA integrated the Facebook Pixel throughout the Website.

70. The numerical identifier associated with the Facebook Pixel Defendant installed on the Website is 2165360733726777.

71. When a FamilyTreeDNA user accessed the Website, FamilyTreeDNA caused the Facebook Pixel to be installed on the user's computer in the location in which the computer was located (here, Illinois).

72. Until at least April 2024, each time a FamilyTreeDNA user accessed a page on the Website, Defendant shared with Meta via the Facebook Pixel an "Event" called "PageView" that told Meta, among other data points, the URL of the page that the consumer was viewing on the Website, which, as described above, disclosed the portions of the Website the user was accessing and, by extension, the fact that the user has obtained a genetic test from FamilyTreeDNA.

73. When FamilyTreeDNA shared the information at issue with Meta, FamilyTreeDNA also shared the c_user cookie, which included the consumer's Facebook ID,

which personally identified in the individual user and connected the user with the other information disclosed to Meta.

74. Therefore, until at least April 2024, as FamilyTreeDNA customers interacted with the Website, FamilyTreeDNA shared with Meta information that confirmed that the user completed the purchase of a genetic testing kit, that the user had obtained the results of genetic testing, that the user viewed the test results, and/or, in some cases, the very test that was run, *e.g.* a Y-DNA test or an mtDNA test.

75. FamilyTreeDNA also integrated the Google Tracking Pixel on the Website.

76. When a FamilyTreeDNA user accessed the Website, FamilyTreeDNA caused the tracking cookies associated with the Google Tracking Pixel (*e.g.*, those cookies identified in Paragraphs 48-53 above) to be installed on the user's computer in the location in which the computer was located (here, Illinois).

77. Once those tracking cookies were installed on the user's computer, the Google Tracking Pixel commanded the user's computer to contemporaneously redirect the following information to Google: (a) the contents of the user's communications with the Website (*e.g.*, the communications described in Paragraph 11 above); and (b) unique identifiers that Google used to identify the Website user (*e.g.*, those identifiers described in Paragraphs 48-53 above), including: IP address; unique, persistent identifiers that are linked to the individual user and can be used by Google to identify the individual user; and device identifiers.

78. The information disclosed to Google via the Google Tracking Pixel also included, among other things, the URL of the page(s) the consumer viewed on the Website.

79. Therefore, as FamilyTreeDNA customers interacted with the Website, FamilyTreeDNA shared with Google information that confirmed that the user completed the

purchase of a genetic testing kit, that the user had obtained the results of genetic testing, that the user viewed the test results, and/or, in some cases, the very test that was run, *e.g.* a Y-DNA test or an mtDNA test. And when FamilyTreeDNA is sharing this and other information with Google, it also shares data that allows Google to identify the individual user.

80. In short, the data FamilyTreeDNA disclosed to Meta and Google included, as part of a single data transmission, both: (a) information showing that a genetic test was purchased and performed, and, in some cases, the exact type of test; and (b) one or more unique individual identifiers.

81. On information and belief, at all relevant times FamilyTreeDNA understood the functionality of the Google and Meta tracking technology, including because: (a) information about these technologies' functionality is widely published online and is also described in the user agreements that FamilyTreeDNA entered into with Google and Meta prior to use; and (b) the entire point of the technologies is to enable FamilyTreeDNA to show targeted advertising to its users' based on their use of the Website, and that cannot be accomplished without sharing the users' use of the Website, along with their identity, to the third-party marketing companies.

82. Tracking pixels such as these are not necessary for Defendant to operate FamilyTreeDNA's platform and are instead used for the purpose of enabling targeted advertising to Defendant's benefit.

83. As a result of Defendant's data compiling and sharing practices, Defendant has knowingly disclosed to Google and Meta and other third parties for its own personal profit the genetic testing information and communications of FamilyTreeDNA's users.

84. Plaintiff and Class Members did not intend or have any reason to suspect their genetic testing information and communications would be shared with Meta and Google, or that

Defendant was tracking their genetic testing information and communications with the Website to Meta and Google.

85. Defendant did not disclose to or warn Plaintiff or Class Members that Defendant used the genetic testing information contained in Plaintiff's and Class Members' Website requests for marketing purposes.

86. Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their genetic testing information.

87. Defendant fails to inform its customers that it discloses this information to third parties and fails to obtain written authorization to disclose such information from the consumer in violation of the statutes at issue.

88. By disclosing its consumers' genetic testing information to unauthorized third parties – which undeniably reveals their identity and that a genetic test was performed on them – Defendant violated the statutes at issue.

**PLAINTIFF ALLEGATIONS**

89. Plaintiff Joshua Saathoff is, and at all relevant times was, a resident and citizen of Illinois.

90. Plaintiff first learned about Defendant's genetic testing services from advertisements he viewed on his computer in Illinois.

91. While in Illinois, Plaintiff created a FamilyTreeDNA account.

92. In 2018, while in Illinois, Plaintiff purchased a genetic testing kit from FamilyTreeDNA.

93. While in Illinois, Plaintiff received his genetic testing kit from FamilyTreeDNA.

94. While in Illinois, Plaintiff followed FamilyTreeDNA's instructions to collect his

DNA for genetic testing and analysis and collected his sample using FamilyTreeDNA's genetic testing kit and sent the sample back to FamilyTreeDNA for analysis.

95. FamilyTreeDNA performed Plaintiffs' genetic testing, including a y-DNA test, and reported to his results to him, including information about his ancestry, via the Website.

96. Below is a copy of a screenshot of Plaintiff's order history (with the "Kit No" partially redacted for privacy).




97. The above screenshot states that Plaintiff "ordered" a "kit" on April 13, 2018; that the "kit" was "sent" on April 16, 2018, and that the "kit" was thereafter "received."

98. Plaintiff also uploaded to the FamilyTreeDNA Website data from a competitor for analysis through FamilyTreeDNA.

99. While in Illinois, Plaintiff accessed his FamilyTreeDNA genetic testing information and analysis on the Website.

100. Plaintiff has interacted with the Website repeatedly since then, as recently as 2021, including to view his family tree and other information derived from the testing that is only

accessible to customers who have completed genetic testing.

101. Since he first created an account with FamilyTreeDNA, Plaintiff has received over 300 emails from FamilyTreeDNA that were delivered to his computer in Illinois.

102. Plaintiff had a Facebook account during the relevant time period.

103. During the relevant time period, Plaintiff accessed the Website, including to view his ancestry—information derived from his DNA testing—while logged into his Facebook account.

104. Plaintiff also had a Google account during the relevant time period.

105. FamilyTreeDNA disclosed to third parties, including Google and Meta, Plaintiff's genetic testing information in a manner that permits third parties, including Google and Meta, to identify Plaintiff as having requested, purchased and completed a genetic test.

106. Plaintiff retained an expert to analyze the data FamilyTreeDNA shared with Meta after Plaintiff logged into his account. That analysis confirmed that the information described throughout this complaint was disclosed to Google and Meta by FamilyTreeDNA when Plaintiff accessed his FamilyTreeDNA account online, through the systematic data sharing practice facilitated by the tracking technologies as described herein.

107. Plaintiff did not provide consent to this disclosure in a manner that complies with GIPA or federal or state law.

108. Upon information and belief, FamilyTreeDNA offers unique genetic testing services that are not available with other competitors.

109. Plaintiff still maintains a Family Tree account that allows him to access his genetic testing results and analysis. Plaintiff does not believe there is another way to access his genetic testing or analysis information from Family Tree, other than through the Website.

110. Plaintiff would like to access his genetic testing information on the Website but he cannot presently do so without his genetic testing information being disclosed to third-parties.

**TOLLING**

111. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that his genetic testing information was unlawfully disclosed because Defendant kept this information secret.

**CLASS ACTION ALLEGATIONS**

112. Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

113. The Class that Plaintiff seeks to represent is defined as follows:

**All individuals residing in the State of Illinois whose genetic testing information was disclosed to a third party through the tracking technologies on Defendant's Website.**

114. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

115. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

116. **Numerosity, Fed R. Civ. P. 23(a)(1)**. The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are at least thousands of individuals whose genetic testing information may have been improperly accessed by the Google and Meta, and the Class is identifiable within Defendant's records. The majority of those

class members are believed to be Illinois residents.

117. **Commonality & Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3)**. Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a) Whether the Defendant's descriptive URLs that identify whether and what type of genetic test was performed is protected genetic testing information under GIPA;

b) Whether Defendant disclosed that information to Google and Meta or other third parties;

c) Whether Defendant first obtained written authorization from its users (e.g., via its privacy policy) prior to disclosing that information; and

d) Whether Defendant's conduct violates GIPA and the other statutes identified herein.

118. **Typicality, Fed. R. Civ. P. 23(a)(3)**. Plaintiff's claims are typical of those of other Class Members because all had their genetic testing information compromised as a result of Defendant's use of the Google and Meta tracking technologies, due to Defendant's misfeasance.

119. **Adequacy, Fed. R. Civ. P. 23(a)(4)**. Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

120. **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3)**. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a defendant, like Defendant, with significant resources. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

121. **Policies Generally Applicable to the Class**. This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final relief, including final injunctive relief, appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

122. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources;

the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

123. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

124. **Ascertainability & Notice**. Membership in the Class can be determined by objective records maintained by Defendant and adequate notice can be given to Class Members directly using information maintained in Defendant's records.

125. **Classwide Injunctive Relief, Fed. R. Civ. P. 23(b)(2)**. Unless a Class-wide injunction is issued, Defendant will continue in its failure to properly secure the genetic testing information of Class Members, and Defendant may continue to act unlawfully as set forth in this Complaint as Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

126. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' genetic testing information;

b. Whether Defendant breached a legal duty to Plaintiff and Class Members by disclosing their genetic testing information;

c. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## FIRST CAUSE OF ACTION

VIOLATION OF THE ILLINOIS GENETIC INFORMATION PRIVACY ACT
410 ILCS 513
(On Behalf of Plaintiff and the Class)

127. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

128. Defendant FamilyTreeDNA is a company and, therefore, a "person" under 410 ILCS 513/10.

129. Plaintiff and the Class purchased a DNA test or tests from the Website and viewed the test results on the Website.

130. Pursuant to the systemic data sharing process described herein, Defendant disclosed to Meta and Google: (1) URLs showing that Plaintiff and the Class purchased a DNA test from the Website; (2) URLs showing that Plaintiff and the Class completed the genetic test, and, depending on the type of test, the specific type of genetic test performed (*e.g.* a Y-DNA test or an MtDNA test); and (3) unique identifiers that allowed Meta and Google to identity the specific Website user.

131. This information constitutes "genetic testing" and/or the "information derived from genetic testing" within the meaning of GIPA because it reveals that a genetic test has been performed. 410 ILCS 513/15.

132. Separate and independently, this information reveals the "identity of any person upon whom a genetic test is performed … in a manner that permits identification of the subject test." 410 ILCS 513/30.

133. Defendant did not obtain written authorization from Plaintiff or the Class members before disclosing this information to third-party marketing companies. 410 ILCS 513/30(a)(2).

134. By disclosing this information, Defendant violated Plaintiff's and the Class's statutorily protected rights to privacy in their genetic information as set forth in GIPA. 410 ILCS 513/15 and 30.

135. Pursuant to 410 ILCS 513/40, "[a]ny person aggrieved by a violation of this Act shall have a right of action in a State circuit court or as a supplemental claim in a federal district court against an offending party."

136. Pursuant to 410 ILCS 513/40, a prevailing party may recover for each violation: (1) against any party who negligently violates a provision of GIPA, liquidated damages of $2,500 oractual damages, whichever is greater; (2) against any party who intentionally or recklessly violates a provision of GIPA, liquidated damages of $15,000 or actual damages, whichever is greater; (3) reasonable attorney's fees and costs, including expert witness fees and other litigation expenses; and (4) such other relief, including an injunction, as the State or federal court may deem appropriate.

137. On behalf of himself and the Class, Plaintiff seeks: (1) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to remove the tracking technology from its Website and comply with GIPA; (2) actual or statutory damages, in an amount to be proven at trial; and (3) reasonable fees and costs. 410 ILCS 513/40(a)(3).

## SECOND CAUSE OF ACTION

VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
18 U.S.C. § 2510 *et seq*.
(On Behalf of Plaintiff and the Class)

118. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

119. The ECPA protects both the sending and receipt of communications.

120. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

121. A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

122. "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

123. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

124. "Contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

125. An "electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

126. Plaintiff and Class Members' interactions with Defendant's Website and their online communications with Defendant are electronic communications under the ECPA.

127. Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the technologies it embedded and ran on its Website, contemporaneously and intentionally intercepted, and endeavored to intercept Plaintiff's and Class Members' electronic communications without authorization or consent.

128. Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the technologies it embedded and ran on the Website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff's and Class Members' electronic communications to third parties, including Google and Meta, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

129. Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the technologies it embedded and ran on the Website, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class Members' electronic communications, for purposes other than providing genetic testing services to Plaintiff and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

130. Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the technologies it embedded and ran on the Website, contemporaneously and intentionally redirected the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Google and Meta.

131. Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the source code it embedded and ran on the Website, contemporaneously and intentionally divulged the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Google and Meta.

132. Defendant intentionally intercepted and used the contents of Plaintiff's and Class Members' electronic communications for the unauthorized purpose of disclosing and, on information and belief, profiting from, Plaintiff's and Class Members' communications by providing the contents to third parties including Google and Meta.

133. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of sharing, including for profit, the personal information contained therein.

134. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

135. Defendant is a "party to the communication" with respect to user communications.

136. Defendant's acquisition of user communications that were used and disclosed to Google and Meta was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and of Illinois, including:

a. Violation of GIPA, 410 ILCS 513;

b. Violation of the Illinois Computer Fraud Act, 720 ILCS 5/17-50;

c. Violation of the Illinois Computer Crime Prevention Law, 720 ILCS 5/17-51; and

137. Defendant violated GIPA as alleged throughout this Complaint.

138. Under 720 ILCS 17-50, "[a] person commits computer fraud when he or she knowingly:

a. Accesses or causes to be accessed a computer or any part therefor, or a program or data, with the intent of device or executing any scheme or artifice to defraud, or as part of a deception;

b. Obtains use of, damages, or destroys a computer or any part thereof, or alters, deletes, or removes any program or data contained therein, in connection with any scheme or artifice to defraud, or as part of a deception; or

c. Accesses or causes to be accessed a computer or any part thereof, or a program or data, and obtains money or control over any such money, property, or services of another in connection with any scheme or artifice to defraud, or as part of a deception.

139. Defendant's conduct violated the Illinois Computer Fraud Act in that:

a. Defendant accessed Plaintiff's and Class Members' computing devices and data as part of a deception and without their authorization, including through placement of cookies associated with the Facebook Pixel and Google Tracking Pixel as well as use of code that commanded Plaintiff's and Class Members' computing devices to send identifiers and the content of communications with Defendant simultaneously to Defendant and Google and Meta;

b. Defendant obtained use of and/or removed data from Plaintiff's and Class Members' computing devices as part of a deception and without their authorization, including through placement, use, and removal of cookies associated with the Facebook Pixel and Google Tracking Pixel as well as use of code that commanded Plaintiff's and Class Members' computing devices to send identifiers and the content of communications with Defendant simultaneously to Defendant and Google and Meta;

c. Defendant accessed or caused to be accessed the Plaintiff's and Class Members' computing devices and data, and thereby obtained control over the Plaintiff's and Class Members' property in the form of their computing devices and right to control access and use of their private genetic testing information as part of a deception and without their authorization, including through placement of cookies associated with the Facebook Pixel and Google Tracking Pixel as well as the use of code that commanded Plaintiff's and Class Members' computing devices to send identifiers and the content of communication with Defendant simultaneously to Google and Meta.

140. The Illinois Computer Crime Prevention Law ("ICCPL") prohibits "computer tampering," and provides a private right of action for whoever "suffers loss by reason of a violation of subdivision (a)(4)." 720 ILCS 5/17-51(c).

141. Subdivision (a)(4) of the ICCPL provides: a) A person commits computer tampering when he or she knowingly and without the authorization of a computer's owner or in excess of the authority granted to him or her: … (4) Inserts or attempts to insert a program into a computer or computer program knowing or having reason to know that such program contains information or commands that will or may… (b) alter, delete, or remove a computer program or data from that computer, or any other computer program or data in a computer subsequently accessing or being accessed by that computer; or (c) cause loss to the users of that computer or the users of a computer which accesses or which is accessed by such program…

142. Defendant violated the ICCPL when it knowingly and without Plaintiff's or Class Members' authorization inserted cookies associated with the Facebook Pixel and Google Tracking Pixel on Plaintiff's and Class Members' computing devices.

143. The cookies associated with the Facebook Pixel and Google Tracking Pixel, which constitute programs, commanded Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google and Meta.

144. Defendant knew or had reason to know that cookies associated with the Facebook Pixel and Google Tracking Pixel would command Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google and Meta.

145. Defendant knew or had reason to know that its use of cookies associated with the Facebook Pixel and Google Tracking Pixel would cause Plaintiff and Class Members to suffer a loss, including:

a. The interruption or preclusion of Plaintiff's and Class Members' ability to communicate with their genetic testing services provider and/or its Website;

b. The diminution in value of Plaintiff's and Class Members' protected genetic testing information;

c. Plaintiff's and Class Members' inability to use their computing devices for the purpose of communicating with their genetic testing services provider without separately sending the aforementioned private genetic testing data to third-party marketing companies;

d. The loss of privacy due to Defendant making sensitive and confidential genetic testing information Plaintiff and Class Members intended to remain private no longer private; and

e. Defendant took something of value from Plaintiff and Class Members and derived benefits therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value.

146. As a direct and proximate result of Defendant's violation of the ECPA, Plaintiff and Class Members were damaged by Defendant's conduct in that:

a. Defendant harmed Plaintiff's and Class Members' interest in privacy;

b. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no more;

c. Defendant eroded the essential confidential nature of its relationship with its genetic testing services provider;

d. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

e. Plaintiff and Class Members did not get the full value of the services for which they paid, which included Defendant's express promise and duty to maintain confidentiality; and

f. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

147. Plaintiff, individually, on behalf of the Class Members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**THIRD CAUSE OF ACTION**

VIOLATION OF THE ILLINOIS EAVESDROPPING STATUTE
720 ILCS § 5/14-1, *et seq.*
(On Behalf of Plaintiff and the Class)

138. The Illinois Eavesdropping Statute ("IES"), 720 ILCS § 5/14-1, *et seq*., prohibits the surreptitious interception, recording, or transcription of private electronic communications without the consent of all parties to the conversation and provides a civil cause of action to a person subjected to a violation of the IES against eavesdroppers and their principals.

148. Under 720 ILCS § 5/14-2(a)(3), the IES makes it unlawful for a person to knowingly and intentionally intercept, record, or transcribe, in a surreptitious manner, any private

electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication.

149. Under 720 ILCS § 5/14-2(a)(5), the IES makes it unlawful for a person to knowingly and intentionally use or disclose any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of the IES, unless he or she does so with the consent of all of the parties.

150. Under 720 ILCS § 5/14-2(a)(4), the IES makes it unlawful for a person to knowingly and intentionally "possesses any electronic, mechanical, eavesdropping, or other device knowing that or having reason to know that the design of the device renders it primarily useful for the purpose of the surreptitious overhearing, transmitting, or recording of private conversations or the interception, or transcription of private electronic communications and the intended or actual use of the device is contrary to the provisions of" the IES.

151. The IES defines "private electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation." 720 ILCS § 5/14-1(e).

152. "Surreptitious," as used in the IES, "means obtained or made by stealth or deception, or executed through secrecy or concealment." 720 ILCS § 5/14-1(g).

153. An "eavesdropper" means "any person…who operates or participates in the operation of any eavesdropping device contrary to the provisions of [the IES] or who acts as a principal[.]" 720 ILCS § 5/14-1(b).

154. A "principal" includes any person who "[k]owingly derives any benefit or information from the illegal use of an eavesdropping device by another" or "[d]irects another to use an eavesdropping device illegally on his or her behalf." 720 ILCS § 5/14-1(c).

155. An "eavesdropping device" is "any device capable of being used to…intercept…electronic communications[.]" 720 ILCS § 5/14-1(a).

156. Plaintiff's communications with Defendant constituted private electronic communications. Plaintiff transmitted their communications to Defendant from their computers or by wire, intended the communications to be private, and reasonably expected the communications to be private under GIPA, Defendant's express promises of confidentiality, the genetic testing services provider-user relationship, and other State and federal laws protecting the confidentiality of Plaintiff's communications.

157. Google and Meta were not parties to Plaintiff's private electronic communications with Defendant. Plaintiff believed they were only communicating with Defendant, intended for their communications to be directed at Defendant only, and were unaware of the presence of concealed technologies and code that redirected their communications.

158. Google and Meta's interceptions of Plaintiff's private electronic communications were knowing, intentional, and surreptitious. Google and Meta intentionally designed their technologies so that they could be concealed on websites to secretly intercept private communications. On information and belief, Google and Meta knew that their technologies were capable of, and in fact did, intercept private electronic communications without the consent of all parties to the communications.

159. Google and Meta used and disclosed Plaintiff's intercepted communications for advertising purposes.

160. Google's and Meta's conduct was done without Plaintiff's consent, in violation of 720 ILCS § 5/14-2(a)(3) and (a)(5).

161. Defendant acted as Google's and Meta's "principal" under the IES. By deploying the source code from Google and Meta on its web-property, Defendant directed that Google and Meta illegally eavesdrop on Plaintiff's private electronic communications on its behalf and Defendant knowingly derived benefits and information from the illegal eavesdropping in the form of marketing and targeted advertising and tracking user interactions with the Website for analytics purposes.

162. Defendant further violated 720 ILCS § 5/14-2(a)(4) by possessing the technologies, knowing that their design rendered them primarily useful for surreptitiously intercepting private electronic communications contrary to the IES.

163. Defendant's violation of the IES was wanton, reckless, and/or malicious.

164. For Defendant's violations of the IES, Plaintiff and Class Members seek actual damages, punitive damages, injunctive relief, and any other relief the Court deems just.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Joshua Saathoff, individually and on behalf of the Class, respectfully requests that this Court enter an Order:

A. Certifying the Class as defined above, appointing Plaintiff Joshua Saathoff as the representative of the Class, and appointing his counsel as Class Counsel;

B. Declaring that Defendant's conduct described herein violates the statutes alleged herein;

C. Awarding liquidated damages of $15,000 or actual damages—whichever is greater—for the intentional and reckless violation of GIPA pursuant to 410 ILCS

513/40(a)(2), or alternatively, liquidated damages of $2,500 or actual damages—whichever is greater—if the Court finds that Defendant's actions were negligent;

D. Enter judgment in favor of Plaintiff and each of the other Class Members for damages suffered as a result of Defendant's conduct alleged herein, including compensatory, statutory, and punitive damages; as well as equitable relief including restitution and disgorgement, to include interest and prejudgment interest;

E. Awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class, including, among other things, an order requiring Defendant to remove the technologies at issue from its Website and comply with GIPA;

F. Awarding reasonable attorneys' fees and costs; and

G. Such other and further relief that the Court deems reasonable and just.

**JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

Date: January 8, 2025

Respectfully submitted,

*/s/ Eric Dwoskin*

**Eric Dwoskin**
DWOSKIN WASDIN LLP
433 Plaza Real, Suite 275
Boca Raton, Florida 33432
(561) 849-8060
edwoskin@dwowas.com